UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————————

PETER LAKE, On Behalf of Himself
and All Others Similarly Situated,

                Plaintiff,

   -against-

FORD MOTOR COMPANY,

                Defendant
——————————————————————

Civil Case No.

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff Peter Lake ("LAKE"), on behalf of himself and all other persons

similarly situated brings this action against defendant, FORD MOTOR COMPANY

("FORD") and to the best of his personal knowledge, information and belief, formed

after an inquiry reasonable under the circumstances, alleges as follows:

### NATURE OF THE ACTION

1.      This case arises from FORD's sale and lease of over 32,000 Ford

Explorer models that are specifically sold annually to state agencies, counties,

towns and municipalities throughout the US that are modified for law enforcement.

These models are classified as Police Interceptor Vehicles and used by Police

Departments and law enforcement agencies as marked police vehicles.  FORD knew

or should have known that these Explorer models, manufactured from 2010 through

2017 are dangerous and defective for operators and passengers such that exhaust

and other gases, including lethal quantities of carbon monoxide, may enter the passenger compartments of the vehicles.  The potential exposure to carbon monoxide renders these vehicles unsafe to drive.  Indeed, FORD has acknowledged a problem with the Explorers that are modified for police and law enforcement use but has failed to remedy the leaks that permit dangerous fumes from entering the cabins of these vehicles.

2.     FORD's Technical Service Bulletin 12-12-4 titled "Explorer Exhaust Odor in Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on. Customers may indicate the odor smells like sulfur."  FORD's TSB 12-12-4 provides instructions that FORD claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.

3.     Subsequent to TSB 12-12-4, FORD issued Technical Service Bulletin 14-0130 ("TSB 14-0130").

4.     Titled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles and adds the 2014 and 2015 models' year Explorers to the list of affected vehicles.  TSB 14-0130 includes the same or similar service procedures outlined in TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4.

5.     FORD's TSB's 12-12-4 and 14-0130 however, do not correct the condition, and they fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles.  Moreover, upon information and belief,

the problem in police equipped Ford Explorers is even more prevalent.  FORD's

TSBs 12-12-4 and 14-0130 are provided to authorized dealerships, and do not

directly notify non-Ford automotive repair facilities or law enforcement personnel

about the defects associated with TSBs 12-12-4 and 14-0130.  Further, although

FORD has received numerous complaints relating to exhaust entering the

passenger compartments of 2011 through 2015 model year Ford Explorers, and it

developed a purported fix to the problem, FORD provided no notice to plaintiff or

the proposed class members about the defect and the potential exposure to lethal

carbon monoxide in 2011 through 2015 model year Ford Explorers.

6.     Upon information and belief, the problem with the 2015 model year

Ford Explorers continued to 2016 and 2017 models, which continue to allow

dangerous and potentially lethal fumes to enter the passenger cabins of these

vehicles.  FORD has sold or leased approximately 32,000 of these Explorers

modified for law enforcement use nationwide since 2011.  Each such vehicle was

sold or leased in a dangerous and defective condition because each such vehicle

contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust

and other gases, including carbon monoxide, to enter the passenger compartment

during the normal and customary use of such vehicles.

7.     FORD designed, manufactured, sold and leased the 2011 through 2017

model year Ford Explorers when it knew or should have known of such defects, or

FORD otherwise learned of such defects and failed to notify plaintiff and the

proposed class members of the defect in the 2011 through 2017 model year Ford

Explorers that exposed plaintiff, the proposed class member, and others, to a life safety hazard.

8.     Plaintiff and the members of proposed class reasonably expect to operate their Ford Explorer vehicles in a normal and customary manner free from exposure to potentially deadly gases.  Moreover, as the proposed class encompasses law enforcement personnel, FORD is aware that these vehicles in particular may be subject to sudden acceleration and vigorous driving.

## JURISDICTION AND VENUE

9.     This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the class is diverse from FORD.

10.     The Court has personal jurisdiction over FORD because FORD conducts substantial business in this District, and some of the actions giving rise to this complaint took place in Nassau County, New York.

11.     Venue is proper in this District under 28 U.S.C. § 1391(a) because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this District and caused harm to class members residing in this District.

## PARTIES

12.     Plaintiff, Peter LAKE, is a resident of Suffolk County, New York, and lives and resides within this judicial district.

13.     FORD is a Delaware corporation with its principal place of business in Michigan.  In this Complaint, "FORD" refers to the named defendant and all related, successor, predecessor and subsidiary entities to which these allegations pertain.

## PLAINTIFF'S INDIVIDIUAL ALLEGATIONS

14.     In or prior to December of 2017, LAKE was assigned to drive and operate a 2016 Ford Explorer by Nassau County Police Department ("the Department.")  As part of the fleet of police vehicles of the Department this vehicle was car number 21 and was known as a Radio Motor Patrol or "RMP."

15.     The 2016 Ford Explorer driven by LAKE through the auspices of the Department was one of approximately 120 Ford Explorers owned and purchased by the Department.  Upon information and belief, all of these Ford Explorers were dangerous and defective when purchased because of their design and exhaust and/or HVAC systems permitted an exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of these RMPs. The defect is latent in nature because it is not obvious or ascertainable upon reasonable examination or inspection.

16.     At the time of the purchase, neither the Department nor LAKE were notified that the 2016 Ford Explorers that were bought were defective, nor was he notified that he and all occupants, including other police officers would be exposed to lethal carbon monoxide and other potentially dangerous gases while driving the 2016 Ford Explorer RMP during routine police duties.

17.     Following an incident with carbon monoxide in the cabin of a RMP in or around August of 2017, the Department in or around December of 2017 gave police officers carbon monoxide detectors for use in Ford Explorers in their fleet. These monitors would routinely go off and the police officers were advised to contact their supervisors when the alarms would sound.

18.   On February 19, 2018 at approximately 11:50 a.m. LAKE was involved in a motor vehicle accident as a result of dangerous levels of carbon monoxide in the cabin of his assigned Ford Explorer.  The hospital noted elevated levels of carbon monoxide in his blood.  LAKE's personal injury claims are specifically excluded from this class action complaint.

19.     Upon information and belief, the Department notified FORD of the problem with the Ford Explorers in its fleet and FORD has failed to remedy and correct them.  As of February 27, 2018, the Police Union has continued to question the Department of the status of the repairs on these vehicles, because the carbon monoxide monitors and alarms have continued to go off, indicating unsafe levels of carbon monoxide in the cabins of these RMPs.

20.     The authorized Ford Fleet Representative for the Department has failed to fix the problem on behalf of the Department, which continues to subject police officers to dangerous fumes.

21.     Carbon monoxide is a colorless, odorless and tasteless gas that is toxic to humans.

22.    LAKE remains a driver/operator of a 2016 Ford Explorer and he, together with other similarly situated law enforcement personnel, are subjected to an ongoing nefarious danger with carbon monoxide exposure while driving these vehicles, as part of his job duties with the Department.

23.    To date, LAKE has been forced by the Department to continue driving a dangerous vehicle, designed, manufactured and sold by FORD.

24.    To date, FORD has not repaired the Department's 2016 Ford Explorers, nor has FORD acknowledged to plaintiff or the members of the proposed class or the county, municipal or state owners of these law enforcement modified Ford Explorers that the 2011 through 2017 model years contain design flaws and/or defective exhaust and/or HVAC systems permitting lethal carbon monoxide and other potentially dangerous gases into the passenger compartments of these vehicles

## GENERAL ALLEGATIONS

### FORD Sold and Leased Dangerous and Defective Vehicles to Law Enforcement

25.    FORD began selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer.

26.    The subsequent model year Ford Explorers are not dramatically different in design from the 2011 model year Ford Explorer, and the Explorers sold today are considered part of the "fifth generation" of Ford Explorer vehicles.

27.     The 2011 through 2017 model year Ford Explorers were designed, engineered and manufactured by FORD with design flaws and/or defective exhaust and/or HVAC systems that, especially with the police modifications, permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner for law enforcement personnel.

28.     FORD designed, manufactured, assembled, inspected, distributed, sold and leased the 2011 through 2017 model year Ford Explorers in a manner so as to render the subject vehicles defective and unsafe for their intended use and purpose by, among other things:

(a) Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

(b) Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

(c) Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(d) Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(e) Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases,

including carbon monoxide, to enter the passenger compartments of the vehicles;

(f) Designing, manufacturing and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles which is even a greater problem in police modified vehicles; and

(g) Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

29.     FORD knew or should have known that the 2011 through 2017 model year Ford Explorers were dangerous and defective such that drivers and passengers of those vehicles and specifically the ones modified for police use may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

30.     The defective vehicles were sold or leased pursuant to express and implied warranties.  These warranties assured consumers that the vehicles were free from defect and were properly equipped for the use for which they were intended.  At the time the defective vehicles were sold or leased by FORD directly and through its authorized agents, the vehicles were in violation of express and implied warranties.  All of the defective vehicles are still within the dates of the express written warranties, or the time or mileage limits in the express warranties should be inapplicable given FORD's fraudulent conduct, among other things.

31.     In promoting, selling and repairing its defective vehicles that are delivered to law enforcement personnel, FORD acts, upon information and belief,

through fleet representatives as well as through numerous authorized dealers who act, and represent themselves to the public, as exclusive FORD representatives and agents.  The fleet representatives and dealers act as FORD's agents and FORD enters into agreements with the law enforcement agencies through the fleet representatives and dealers.  FORD directs its authorized fleet representatives and dealers to respond to complaints and inquiries concerning defective vehicles.

32.     FORD's control over the actions of its fleet representatives and dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the defects alleged herein.  Authorized FORD dealerships are instructed by FORD to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130.

### FORD Acknowledged the Subject Vehicles'<br>Defective Condition in TSBs 12-12-4 and 14-0130

33.     In response to customer complaints of an exhaust odor in the passenger compartments of the subject vehicles, FORD issued TSB 12-12-4 in or about December 2012.  TSB 12-12-4 was intended to provide instructions to authorized FORD dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

34.     In or about July 2014, FORD issued TSB 14-0130, which added 2014 and 2015 model year Ford Explorers to the list of affected vehicles.  TSB 14-0130 was intended to provide instructions to authorized FORD dealerships to correct the presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

-10-

35.     Notwithstanding the issuance of TSBs 12-12-4 and 14-0130, FORD did not inform plaintiff or the members of the proposed class of the defects in 2011 through 2017 model year Ford Explorers, despite the fact that those defects presented life safety issues to occupants of the vehicles.

36.     Notably, TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor acknowledged therein is accompanied in the passenger compartment by lethal carbon monoxide.

37.     At all material times, FORD has failed to inform law enforcement agencies and personnel who are the end users of the 2011 through 2017 model year Ford Explorers that they are unsafe for operation or that they were designed, engineered and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles.

38.     In addition, TSBs 12-12-4 and 14-0130 do not identify a specific fix to the exhaust odor problem.  Rather TSBs 12-12-4 and 14-0130 require various replacements and/or repairs to several unrelated vehicle parts.  This demonstrates that FORD knew of the defect, but did not know of a specific, effective fix to protect occupants of the 2011 through 2017 model year Ford Explorers from exhaust and other gases, including carbon monoxide.  Based upon information and belief, Ford issued TSBs 12-12-4 and 14-0130 hoping, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints.

-11-

## FORD's TSBs 12-12-4 and 14-0130
## Fail to Repair the Defects

39.     FORD's TSBs 12-12-4 and 14-0130 fail to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases, including carbon monoxide, enter the passenger compartment.

40.     TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2011 through 2017 model year Ford Explorer and prescribe repairs and/or replacements which are inadequate and equally flawed and defective.

41.     In TSBs 12-12-4 and 14-0130, FORD requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSV 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft © Seam sealer (part number TA-2).

42.     TSBs 12-12-4 and 14-0130 require that the dual rate air extractor replace the driver side rear air extractor initially on the subject vehicle.  The rear air extractor initially installed on the subject vehicle was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the subject vehicles and enter the passenger compartment.  Based upon information and belief, FORD requires the replacement of the driver side air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air condition system is situated dangerously close

in proximity to the driver side rear air extractor.  The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system.

43.    The replacement part – a dual rate air extractor – is formed of polypropylene and overmolded with thermoplastic elastomer (TPE).  The dual rate air extractor includes "living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve.

44.    The dual rate air extractor has a listed purchase price of $86.33, whereas the initially installed air extractor has a listed purchase price of $22.50. However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartments of the subject vehicles.  The replacement dual rate air extractors are therefore ineffective, dangerous and defective.

45.    In addition, FORD modified the dual rate air extractors used as replacement parts per TSBs 12-12-4 and 14-0130, by haphazardly adding a silicone-like white substance to the uppermost of the three "living hinges."  Based upon information and belief, the silicone-like white substance found on replacement part number BB5Z-61280B62-A is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its manufacturer.  Moreover, the silicone-like white substance added by FORD to the dual rate air extractor causes the "living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the vehicles, and enter the passenger compartment.

-13-

46.     FORD designed, manufactured and engineered the 2011 through 2017 model year Ford Explorers using valve assembly auto drains on the rear liftgate of the vehicles which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment. The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment, and thus, they are ineffective, dangerous and defective.

47.     FORD designed, manufactured, engineered and assembled the 2011 through 2017 model year Ford Explorers without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the subject vehicles.  FORD additionally designed, manufactured, engineered and assembled the 2011 through 2017 model year Ford Explorers without properly sealing the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines.  Accordingly, TSBs 12-12-4 and 14-0130 require that the foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized undercoating, and seam sealer.  However, the rubberized undercoating and seam sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

48.     TSB 14-0130 additionally requires the reprogramming of the HVAC module to the latest calibration.  Reprogramming the HVAC module, however, fails to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

-14-

## FORD's Conduct and/or Inaction Has Damaged
## Plaintiff and Members of the Proposed Class

49.     Plaintiff and each member of the proposed class has been damaged by FORD's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, they unknowingly drive or are passengers in defective vehicles which cannot be safely operated.  They are exposed to unwanted and harmful fumes and risk their safety when operating or driving in these vehicles.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the members of a proposed Class.  The requirements of Rule 23(a), (b)(2) and (b)(3) are each met with respect to the classes defined below.

51.     Plaintiff seeks to represent the following class:

> All persons who formerly or currently operate or drive at least one of the following vehicles, that has been modified by FORD, for police use:

> 2011 Ford Explorer, 2012 Ford Explorer, 2013 Ford Explorer, 2014 Ford Explorer, 2015 Ford Explorer, 2016 Ford Explorer and/or 2017 Ford Explorer.

52.     Numerosity.  Members of the class are so numerous that individual joinder of all members is impracticable.  Based upon information and belief, on an annual basis, FORD has sold approximately 32,000 of these vehicles modified for police use.  All of these Ford Explorers are covered by TSBs 12-12-4 and 14-0130 and contain a defect that may cause carbon monoxide or exhaust to enter the passenger compartments of such vehicles.

53.     Existence of Common Questions of Law and Fact.  Common questions of law and fact exist as to all members of the class.  These include, but are not limited to:  whether the 2011 through 2017 model year Ford Explorers have been sold or leased subject to express and/or implied warranties; whether each 2011 through 2017 model year Ford Explorer is defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles;  whether the 2011 through 2017 model year Ford Explorers modified for police use suffer from a design defect, are unreasonable, dangerous and/or are unfit for their intended use; whether FORD has knowledge of such defect;  when FORD learned of such defect; whether FORD failed to disclose the defect to plaintiff and the class; whether FORD misrepresented that the affected vehicles were safe;  whether Ford has a fix to the defect and, if so, how much the fix will cost;  whether FORD'S express warranties cover the latent defects;  whether FORD breached its warranties made to plaintiff and the class;  whether FORD negligently designed/engineered/manufactured the affected vehicles;  whether FORD concealed the defect;  and whether plaintiff and the class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage including properly repairing and sealing the vehicles to protect the occupants from carbon monoxide.

54.     Typicality.  The claims of the plaintiff are typical of the claims of the class, as plaintiff and members of the class are law enforcement personnel who are end users in that they are operators or passengers of these vehicles and have been harmed in some manner by FORD's conduct.

55.   Adequacy.  Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff's interests do not conflict with the interests of the members of the class.  Further, plaintiff has retained counsel competent and experienced in complex class action litigation.  Plaintiff and his counsel are committed to vigorously prosecuting this action.

56.   Predominance and Superiority.  A class action is superior to other available methods for the fair and equitable adjudication of the controversy, since joinder of all the individual class members is impracticable.  Questions of law and fact common to the members of the class predominate over any questions affecting only individual members.  Likewise, because the damages suffered by each individual class member may be relatively small, the expense and burden of individual members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

57.   The prosecution of separate actions by the individual class members would also create a risk of inconsistent or varying adjudications for individual class members, which would establish incompatible standards of conduct for FORD.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.  Further, plaintiff anticipates no difficulty in the management of this litigation as a class action.

58.   For all the foregoing reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT 1
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

59.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 58 as if fully set forth herein.

60.     This count is brought on behalf of the class.

61.     Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

62.     FORD is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4) -(5).

63.     The subject 2011 through 2017 model year Ford Explorers are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

64.     15 U.S.C. § 2310(d)(1) provides cause of action for any consumer who is damaged by, among other things, the failure of a warrantor to comply with written or implied warranties.

65.     FORD sells and leases its vehicles subject to express warranties which are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  FORD additionally sells and leases its vehicles subject to implied warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

66.     When plaintiff and members of the class operate or drive in their 2011 through 2017 model year Ford Explorers, FORD expressly warranted that the

vehicles would be free from defects in design, materials and workmanship.  FORD promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

67.    When plaintiff and members of the class operated or drove in their 2011 through 2017 model year Ford Explorers, FORD impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by owners and lessees, and were not otherwise injurious to operators and passengers.  FORD was under a duty to design, construct, manufacture, inspect and test the vehicles so as to make then suitable for the ordinary purpose of their use.

68.    The subject 2011 through 2017 model year Ford Explorers share a common defect in that they have been designed and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartment of such vehicles during their normal and customary use.  FORD is aware of the defect and has acknowledged the problem of an exhaust odor inside the passenger compartment of such vehicles by its issuance of TSBs 12-12-4 and 14-0130.  However, TSBs 12-12-4 and 14-0130 do not disclose the presence of carbon monoxide inside the passenger compartment of the subject vehicles, nor do they fix the problem of exhaust and other gases entering the passenger compartment.  FORD has breached its express and implied warranties by failing to disclose a life safety defect in the subject vehicles, by failing to fix the defects in the subject

vehicles, and by selling or leasing vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

69.     Plaintiff and each of the members of each class have had sufficient direct dealings with either FORD or its agent fleet representatives to establish privity of contract between FORD, on the one hand, and Plaintiff and each of the members of the class, on the other hand.  Notwithstanding, plaintiff and each of the members of the class are the intended beneficiaries of FORD's express and implied warranties.  The dealers were not intended to be the ultimate consumers of the subject vehicles and have no rights under the warranty agreements provided by FORD.  FORD's warranties were designed for and intended to benefit users of these vehicles.

70.     Affording FORD, a reasonable opportunity to sure its breach of written warranties would be unnecessary and futile here.  FORD has known, or should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the subject vehicles' defect resulting in exhaust and other gases, including carbon monoxide entering the passenger compartment of such vehicles. Notwithstanding, FORD has failed to disclose the existence of this defect and the risk of carbon monoxide exposure and has failed to rectify the situation.  FORD's authorized fleet representatives, on information and belief, expressly represent that no carbon monoxide enters the passenger compartment of the subject vehicles and that the problem is limited to a non-safety related issue of odor only – a false representation.  Under the circumstances, any requirement that plaintiff afford

FORD a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

71.     The amount in controversy of plaintiff's individual claims meets or exceeds the sum of $25.00.  The amount in controversy of this action exceeds the sum of $50,000.00, exclusive of interests and costs, computed on the basis of all repair claims to be determined in this lawsuit.

72.     Plaintiff, individually and on behalf of the other class members, seek injunctive relief first, that these vehicles be retrofitted and/or properly repaired so there are not more harmful gas vapors in the cabins of law enforcement FORD Explorers for 2011-2017 model years.   Plaintiff also requests all damages permitted by law, including repair cost or injunctive relief requiring adequate repair of these vehicle in an amount to be proven at trial.

## COUNT II
## BREACH OF EXPRESS WARRANTY

73.     Plaintiff repeats and re-alleges the allegations in Paragraph 1 through 58 as if fully set forth herein.

74.     This Count is brought on behalf of the class.

75.     For each defective vehicle sold by FORD, an express written warranty was issued which covered the vehicle, warranting the vehicle to be free of defects in materials and workmanship at the time of delivery.

76.     FORD had certain obligations under the Uniform Commercial Code as adapted by all states to conform the subject 2011 through 2017 model year Ford Explorers to the express warranties given by FORD.

77.     Plaintiff and members of the class operated or drove in their 2011 through 2017 model year Ford Explorers, FORD expressly warranted that the vehicles would be free from defects in design, materials and workmanship.  FORD promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

78.     FORD breached its express warranties by offering for sale and selling or leasing as unsafe, defective vehicles that were by design and construction unsafe, thereby subjecting occupants of the defective vehicles purchased or leased by plaintiff and members of the class to the risk of injury or death.

79.     The defects at issue in this litigation were present in the subject vehicles at the time of sale or lease to plaintiff and the members of the class.

80.     The defects at issue in this litigation must be corrected by FORD and the expenses of such repairs must be borne by FORD, per FORD's express warranties.

81.     FORD breached its express warranties (and continues to breach its express warranties) because it has not fixed the defects which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the subject vehicles, nor has it covered the expenses associated with correcting the defect.

82.     Plaintiff and the members of the class have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of FORD or by operation of law in light of FORD's conduct described throughout this Complaint.

83.     Any arbitration or class waiver provisions included in FORD's express warranties are substantively and procedurally unconscionable and therefore unenforceable.

84.     FORD has received timely notice regarding the problems at issue in this litigation and notwithstanding, FORD has failed and refused to offer an effective remedy.

85.     Plaintiff and the members of the class have suffered damages caused by FORD's breach of the express warranties and are entitled to have these vehicles properly repaired on their behalf.

## COUNT III
## BREACH OF IMPLIED WARRANTY

86.     Plaintiff repeats and re-alleges the allegations in Paragraph 1 through 58 as if fully set forth herein.

87.     This Count is brought on behalf of the class.

88.     FORD impliedly warranted that the subject vehicles, which FORD designed, manufactured, sold or leased, were merchantable, fit for ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers.  The ordinary purpose for which the subject vehicles are used is,

among other things, to drive in a manner that does not unnecessarily and unreasonably expose occupants to needless harm or risk.

89.     FORD breached its implied warranty of merchantability when it designed, manufactured, distributed, sold and leased the 2011 through 2015 model year Ford Explorer in an unsafe and un-merchantable condition.  The subject vehicles threaten to expose occupants to carbon monoxide and other dangerous gases while the vehicles are being driven in a normal and customary manner.

90.     Plaintiff and each of the members of the class have had sufficient direct dealings with either FORD or its fleet representatives to establish privity of contract between Ford, on the one hand, and plaintiff and each of the members of the class, on the other hand.  Notwithstanding, privity is not required because plaintiff and each of the members of the class are the intended beneficiaries of FORD's written warranties and its contractual relationship with FORD dealerships. The fleet representatives and dealers were not intended to be the ultimate consumers of the subject vehicles and have no rights under the warranty agreements provided by FORD.  FORD's express warranties were designed for and intended to benefit the consumers and specifically in this case, end users who are operators and passengers of the defective vehicles.  Plaintiff and the members of the class were known by FORD to be occupants in these vehicles.

91.     Plaintiff and the members of the class have suffered damages caused by FORD's breach of the implied warranty of merchantability and are entitled to

recover compensatory damages, including but not limited to the cost of repairs and having the repairs performed on these vehicles.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on his own behalf and on behalf of the class, respectfully requests judgement against Ford:

(a)  Certifying the class and appointing plaintiff and his counsel to represent the class.

(b)  Ordering FORD to provide notice to the class of the defect with, among other things, the design of the vehicles, and/or the exhaust and/or HVAC systems in the 2011 through 2017 model year Ford Explorers which have been modified for police use, such that carbon monoxide and exhaust gets into the passenger compartments of such vehicles during their normal and customary use;

(c)  Ordering FORD to promptly repair and/or replace, without charge, all subject vehicles to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartments of such vehicles;

(d) Enjoining FORD from selling any more Ford Explorers with a carbon monoxide issue that exposes law enforcement operators and/or passengers to harm;

(d)  Awarding damages which include, but are not limited to, the cost of any repairs;

(e)  Awarding pre-judgment and post-judgment interest;

(f)  Awarding attorney's fees and costs; and

(g)  Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable.

Dated: April 4, 2018

**BLAU, LEONARD LAW GROUP, LLC**

Steven Bennett Blau
Shelly A. Leonard
23 Green Street, Suite 303
Huntington, New York 11743
(631) 458-1010
sblau@blauleonardlaw.com
sleonard@blauleonardlaw.com

**BROWN PAINDIRIS & SCOTT, LLP**
Bruce E. Newman
747 Stafford Avenue
Bristol, CT 0601
Tel: (860) 583-520
Fax: (860)589-5780
bnewman@bpslawyers.com


*Attorneys for Plaintiff*