UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

PETER LAKE and TIMOTHY CREED,
Individually, And On Behalf of All Others
Similarly Situated,

Civil Case No.
2:18-cv-02009-SJF-AYS

Plaintiffs,

-against-

FORD MOTOR COMPANY,

Defendant.
_____

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, PETER LAKE and TIMOTHY CREED, ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, bring this action against defendant, FORD MOTOR COMPANY ("FORD") based upon the best of their personal knowledge, information and belief, formed after an inquiry reasonable under the circumstances, and allege as follows:

## NATURE OF THE ACTION

1.    This case arises from FORD'S sale and lease of over 32,000 Ford Explorer models that are specifically sold annually to state agencies, counties, towns and municipalities throughout the US that are modified for law enforcement. These models are classified as Police Interceptor Vehicles and used by Police Departments and law enforcement agencies as marked police vehicles.

2.    FORD knew or should have known that these Explorer models, manufactured from 2011 through 2017 are dangerous and defective for operators and passengers such that exhaust and other gases, including lethal quantities of carbon monoxide,

1

may enter the passenger compartments of the vehicles.  The potential exposure to carbon monoxide renders these vehicles unsafe to drive.  Indeed, FORD has acknowledged a problem with the Explorers that are modified for police and law enforcement use but has failed to remedy the leaks that permit dangerous fumes from entering the cabins of these vehicles.

3.    FORD'S Technical Service Bulletin 12-12-4 titled "Explorer Exhaust Odor in Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on.  Customers may indicate the odor smells like sulfur."  FORD'S TSB 12-12-4 provides instructions that FORD claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.

4.    Subsequent to TSB 12-12-4, FORD issued Technical Service Bulletin 14-0130 ("TSB 14-0130"). entitled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles and adds the 2014 and 2015 models' year Explorers to the list of affected vehicles.  TSB 14-0130 includes the same or similar service procedures outlined in TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4.

5.    FORD'S TSB's 12-12-4 and 14-0130 however, do not correct the condition, and they fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles.  Moreover, upon information and belief, the problem in police equipped Ford Explorers is even more prevalent.  Ford's TSBs 12-

12-4 and 14-0130 are provided to authorized dealerships, and do not directly notify non-Ford automotive repair facilities or law enforcement personnel about the defects associated with TSBs 12-12-4 and 14-0130.

6.     Further, although FORD has received numerous complaints relating to exhaust entering the passenger compartments of 2011 through 2015 model year Ford Explorers, and it developed a purported fix to the problem, FORD provided no notice to plaintiffs or the proposed class members about the defect and the potential exposure to lethal carbon monoxide in 2011 through 2015 model year Ford Explorers.

7.     Upon information and belief, the problem with the 2015 model year Ford Explorers continued to 2016 and 2017 models, which continue to allow dangerous and potentially lethal fumes to enter the passenger cabins of these vehicles.  Ford has sold or leased approximately 32,000 of these Explorers modified for law enforcement use nationwide since 2011.  Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment during the normal and customary use of such vehicles.

8.     FORD designed, manufactured, sold and leased the 2011 through 2017 model year Ford Explorers when it knew or should have known of such defects, or Ford otherwise learned of such defects and failed to notify plaintiff and the proposed class members of the defect in the 2011 through 2017 model year Ford Explorers

3

that exposed plaintiff, the proposed class member, and others, to a life safety hazard.

9.     Plaintiffs and the members of proposed class reasonably expected to operate their Ford Explorer vehicles in a normal and customary manner, free from exposure to potentially deadly gases.  Moreover, as the proposed class encompasses law enforcement personnel, FORD is aware that these vehicles, in particular, may be subject to sudden acceleration and vigorous driving.

## JURISDICTION AND VENUE

10.     The provisions of the Class Action Fairness Act ("CAFA"), 18 U.S.C. § 1332(d) explicitly provide for the original jurisdiction of the Federal Courts in any class action in which any member of the plaintiff class is a citizen of a State different from any defendant, and in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs.

11.     Plaintiffs allege that the total claims of individual class members in this action are well in excess of $5,000,000 in the aggregate, exclusive of interests and costs, as required by 28 U.S.C. §§ 1332(d)(2)(5).

12.     Plaintiffs are Citizens of New York. FORD is a Delaware corporation with its principal place of business in Michigan.

13.     Diversity of citizenship exists under CAFA, as required by 28 U.S.C. §§ 1332(d) (5) (B).

14.     The total approximate number of members of the proposed Plaintiff Class is at least 2500 persons.

15.     The Court has personal jurisdiction over FORD because FORD conducts substantial business in this District, and some of the actions giving rise to this complaint took place in this District.

16.     Venue is proper in this District under 28 U.S.C. § 1391(a) because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this District and caused harm to class members residing in this District.

## PARTIES

17.     Plaintiff, PETER LAKE, is a citizen and resident of Suffolk County, New York.

18.     Plaintiff, TIMOTHY CREED, is a citizen and resident of Nassau County, New York.

19.     FORD is a Delaware corporation with its principal place of business in Michigan.  In this Complaint, "FORD" refers to the named defendant and all related, successor, predecessor and subsidiary entities to which these allegations pertain.

## CARBON MONOXIDE

20.     According to the Centers for Disease Control, excess exposure to Carbon Monoxide is responsible for more than 400 deaths every year in the United States.

21.     Exposure to Carbon Monoxide is particularly dangerous because the gas is odorless and symptoms-loss of consciousness, nausea, headaches, or light headedness-mimic flu- like symptoms, delaying reaction time from victims and emergency personnel in determining the root cause of the injury.

21.     CO is a potent neuro- and cardiovascular toxin. CO is slightly lighter than air. It mixes freely with air in any proportion, moves with air in bulk transport, and adsorbs to few substances in common use.

23.     CO is generally produced by the combustion of carbonaceous compounds.

24.     CO is not detectable by humans without the use of chemical or electronic equipment.

25.     When inhaled by the body, CO primarily reacts with heme-containing substances such as hemoglobin, contained in red blood cells. In doing so, it blocks the carriage of oxygen by these cells.

26.     Inhalation is the primary route of CO uptake. Small amounts of CO are also produced in the body by degradation of hemoglobin and related compounds. Exposure to low levels of CO can occur outdoors as well as indoors. Sources of CO indoors and outdoors are usually the combustion of fossil fuels.

27.     Since 2000, it has been understood that the effect of CO exposure is due to hypoxia, a condition or state in which the supply of oxygen is insufficient for normal life functions.

28.     CO enters the body via inhalation and is diffused across the alveolar membrane with nearly the same ease as oxygen.  After dissolving in the blood, it is quickly bound to hemoglobin (Hb) to form carboxyhemoglobin (COHb), which is measured as the percent of hemoglobin bound. CO competes with oxygen for the hemoglobin binding sites, but unlike oxygen, which is quickly and easily released from its hemoglobin bond, CO remains bound for a much longer time.

29.     The result of COHb build-up over time is hypoxemia, a condition or state where there is a low arterial oxygen supply. CO also increases the binding strength of oxygen to hemoglobin, making release of oxygen to tissue more difficult.

30.     The great body of research on CO has revealed various cellular mechanisms that do not require hypoxic stress. Intracellular uptake of CO could be a major cause of neurological damage. When CO binds to cytochrome oxidase, it causes mitochondrial dysfunction. Mitochondrial disease is a chronic, genetic disorder that occurs when the mitochondria of the cell fail to produce enough energy for cell or organ function. These processes are not dependent on "hypoxia" per se.

31.     Other recent studies have found that CO poisoning can cause immune system dysfunction that causes decrements in cognitive functioning (Thom et al., 2004).

32.     There is a growing consensus that for CO, as well as several other chemical toxins and ionizing radiation, no AEL (Acceptable Exposure Level) exists (Schwela, 2000). In the past, a so-called "safe level" was arbitrarily set at a point at which no health effects could be detected or at least the number and severity identified were deemed acceptable. Research and literature on carbon monoxide demonstrates that CO exposure at levels less than 9 ppm can result in health effects.

33.     There may be no AEL for CO, and the lower limit of CO exposure that the scientific community believes will not cause injury or morbidity has decreased with time and continues to do so.

34.     Epidemiological studies involving large population groups, where exposures are generally at very low CO levels, have demonstrated increased incidences of low birth weight, congenital defects, infant and adult mortality, cardiovascular

admissions, congestive heart failure, stroke, asthma, tuberculosis, pneumonia, etc. (WHO 2010). Dose-effect relationships are suggested in some epidemiological studies. The body of literature is large and growing. The findings are consistent with subtle but often profound health effects at low CO levels.

35.     The 2011-2017 Ford Explorer is a gasoline-fueled passenger carrying motor vehicle. The Owner's Manual provides no restrictions with regard to what passengers can be accommodated, and it provides no restriction as to the duration of occupancy within the passenger cabin. As such, toxic limits designed to maintain health must be those appropriate for the most sensitive and vulnerable humans who may choose to drive or ride in it.

36.     The Ford Motor Company Owner's Manual for the Explorer (pg. 208) contains a warning that "Carbon monoxide is present in exhaust fumes - Take precautions to avoid its dangerous effects." This warning demonstrates that Ford was previously aware of the threat to human health and safety posed by CO.

37.     Ford Motor Company documents show that CO may infiltrate the passenger cabin of 2011-2017 Ford Explorers, as engine exhaust fumes from the exterior rear of the vehicle seeps into the cabin.

38.     People riding in the 2011-2017 Ford Explorer may be exposed to CO at significantly increased levels compared to those same people inhaling outside air.

39.     The infiltration of exhaust gas, including carbon monoxide into the passenger cabin of 2011-2017 Ford Explorers, is unacceptable and is potentially dangerous to human health and safety.

8

40.     CO exposure by humans of all ages, conditions of health, and under various environmental conditions inside the 2011-2017 Ford Explorers should not exceed the 201O indoor WHO guideline that applies to 24-hours of CO exposure, i.e. 6.1 ppm, computed as a time-weighted average (TWA).

41.     In concert with the above, or alternatively, exposures of humans of all ages, conditions of health, and under various environmental conditions inside the 2011-2017 Ford Explorers, should not exceed the EPA, outdoor CO guideline that applies to 8-hours of CO exposure, i.e. 9.0 ppm, computed as a time-weighted average (TWA) over 8-hours.

42.     Exposure to CO greater than these standards inside a 2011-2017 Ford Explorer produces an unacceptable level of risk of health harm.

43.     The present CO guideline used by Ford Motor Company, i.e. 27 ppm (and above), TWA, is not in conformity with our present understanding of science and medicine as it regards the effects of CO on human health, and as such is not appropriate for present-day use in approaching human health and safety with regard to CO exposure.

44.     To the extent carbon monoxide studies, research and literature demonstrate that even the lowest levels of carbon monoxide may cause health harm, it is unacceptable, unexpected and unnecessarily and/or unreasonably dangerous for the interior of the 2011-2017 Ford Explorers to expose occupants to levels of CO in excess of that found in ambient air.

## GENERAL ALLEGATIONS

### Ford Sold and Leased Dangerous and Defective Vehicles to Law Enforcement

45.    FORD began selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer.

46.    The subsequent model year Ford Explorers are not dramatically different in design from the 2011 model year Ford Explorer, and the Explorers sold today are considered part of the "fifth generation" of Ford Explorer vehicles.

47.    The 2011 through 2017 model year Ford Explorers were designed, engineered and manufactured by FORD with design flaws and/or defective exhaust and/or HVAC systems that, especially with the police modifications, permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner for law enforcement personnel.

48.    FORD designed, manufactured, assembled, inspected, distributed, sold and leased the 2011 through 2017 model year Ford Explorers in a manner so as to render the subject vehicles defective and unsafe for their intended use and purpose by, among other things:

(a)    Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

(b)    Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper

and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

(c)     Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(d)     Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(e)     Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(f)     Designing, manufacturing and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles which is even a greater problem in police modified vehicles; and

g)     Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

49.     FORD knew or should have known that the 2011 through 2017 model year Ford Explorers were dangerous and defective such that drivers and passengers of

those vehicles and specifically the ones modified for police use may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

50.   The defective vehicles were sold or leased pursuant to express and implied warranties.  These warranties assured consumers that the vehicles were free from defect and were properly equipped for the use for which they were intended.  At the time the defective vehicles were sold or leased by FORD directly and through its authorized agents, the vehicles were in violation of express and implied warranties.

51.   In promoting, selling and repairing its defective vehicles that are delivered to law enforcement personnel, FORD acts, upon information and belief, through fleet representatives as well as through numerous authorized dealers who act, and represent themselves to the public, as exclusive FORD representatives and agents.

52.   The fleet representatives and dealers act as FORD'S agents and FORD enters into agreements with the law enforcement agencies through the fleet representatives and dealers. FORD directs its authorized fleet representatives and dealers to respond to complaints and inquiries concerning defective vehicles.

53.   FORD'S control over the actions of its fleet representatives and dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the defects alleged herein.  Authorized FORD dealerships are instructed by FORD to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130.

## Ford Acknowledged the Subject Vehicles' Defective Condition in TSBs 12-12-4 and 14-0130

54.     In response to customer complaints of an exhaust odor in the passenger compartments of the subject vehicles, FORD issued TSB 12-12-4 in or about December 2012.  TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

55.     In or about July 2014, Ford issued TSB 14-0130, which added 2014 and 2015 model year Ford Explorers to the list of affected vehicles.  TSB 14-0130 was intended to provide instructions to authorized FORD dealerships to correct the presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

56.     Notwithstanding the issuance of TSBs 12-12-4 and 14-0130, FORD did not inform Plaintiffs or the members of the proposed class, of the defects in 2011 through 2017 model year Ford Explorers, despite the fact that those defects presented life safety issues to occupants of the vehicles.

57.     Notably, TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor acknowledged therein is accompanied in the passenger compartment by lethal carbon monoxide.

58.     At all material times, FORD has failed to inform law enforcement agencies and personnel who are the end users of the 2011 through 2017 model year Ford Explorers that they are unsafe for operation or that they were designed, engineered and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles.

59..    In addition, TSBs 12-12-4 and 14-0130 do not identify a specific fix to the exhaust odor problem.  Rather TSBs 12-12-4 and 14-0130 require various replacements and/or repairs to several unrelated vehicle parts.  This demonstrates that FORD knew of the defect, but did not know of a specific, effective fix to protect occupants of the 2011 through 2017 model year Ford Explorers from exhaust and other gases, including carbon monoxide.  Based upon information and belief, Ford issued TSBs 12-12-4 and 14-0130 hoping, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints.

Ford's TSBs 12-12-4 and 14-0130 Fail to Repair the Defects

60.    FORD'S TSBs 12-12-4 and 14-0130 fail to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases, including carbon monoxide, enter the passenger compartment.

61.    TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2011 through 2017 model year Ford Explorer and prescribe repairs and/or replacements which are inadequate and equally flawed and defective.

62.    In TSBs 12-12-4 and 14-0130, FORD requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSV 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft © Seam sealer (part number TA-2).

63.     TSBs 12-12-4 and 14-0130 requires that the dual rate air extractor replace the driver side rear air extractor initially on the subject vehicle.  The rear air extractor initially installed on the subject vehicle was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the subject vehicles and enter the passenger compartment. Based upon information and belief, FORD requires the replacement of the driver side air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air condition system is situated dangerously close in proximity to the driver side rear air extractor.  The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system.

64.     The replacement part – a dual rate air extractor – is formed of polypropylene and overmolded with thermoplastic elastomer (TPE).  The dual rate air extractor includes "living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve.

65.     The dual rate air extractor has a listed purchase price of $86.33, whereas the initially installed air extractor has a listed purchase price of $22.50.  However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartments of the subject vehicles.  The replacement dual rate air extractors are therefore ineffective, dangerous and defective.

66.     In addition, FORD modified the dual rate air extractors used as replacement parts per TSBs 12-12-4 and 14-0130, by haphazardly adding a silicone- like white

15

substance to the uppermost of the three "living hinges."  Based upon information

and belief, the silicone-like white substance found on replacement part number

BB5Z-61280B62-A is not included, and was not meant to be included, as part of the

dual rate air extractor as designed by its manufacturer.  Moreover, the silicone-like

white substance added by FORD to the dual rate air extractor causes the "living

hinges" to remain open, permitting exhaust and other gases to permeate the

exterior panels of the vehicles, and enter the passenger compartment.

67.     FORD designed, manufactured and engineered the 2011 through 2017 model

year Ford Explorers using valve assembly auto drains on the rear liftgate of the

vehicles which are dangerous and defective because the parts permit exhaust and

other gases, including carbon monoxide, to enter the passenger compartment.  The

replacement valve assembly auto drains fail to prevent exhaust and other gases,

including carbon monoxide, from entering the passenger compartment, and thus,

they are ineffective, dangerous and defective.

68.     FORD designed, manufactured, engineered and assembled the 2011 through

2017 model year Ford Explorers without properly sealing the horizontal sheet metal

lap joints on the left and right sides of the underbody of the subject vehicles.

69.     FORD additionally designed, manufactured, engineered and assembled the

2011 through 2017 model year Ford Explorers without properly sealing the rear

sheet metal overlap flange across the rear of the vehicle, and the auxiliary air

conditioning lines.  Accordingly, TSBs 12-12-4 and 14-0130 require that the

foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized

undercoating, and seam sealer.  However, the rubberized undercoating and seam

16

sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

70.     TSB 14-0130 additionally requires the reprogramming of the HVAC module to the latest calibration.  Reprogramming the HVAC module, however, fails to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

### Ford's Conduct and/or Inaction Has Damaged Plaintiff and Members of the Proposed Class

71.     Plaintiffs and each member of the proposed Class has been damaged by FORD'S conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, and they unknowingly drive or are passengers in defective vehicles which cannot be safely operated.  They are exposed to unwanted and harmful fumes which create risk to their health and safety, while operating or driving in these vehicles.

### PLAINTIFFS' INDIVIDIUAL ALLEGATIONS

72.     At all relevant times, Plaintiff LAKE was a police officer employed by the Nassau County Police Department.

73.     At all relevant times, Plaintiff CREED was a police officer employed by the Nassau County Police Department.

74.     In or prior to December of 2017, LAKE was assigned to drive and operate a 2016 Ford Explorer by Nassau County Police Department ("the Department.") As part of the fleet of police vehicles of the Department, this vehicle was designated car No. 21 and was known as a Radio Motor Patrol or "RMP" vehicle.

75.     In or prior to December of 2017, CREED was assigned to drive and operate two (2) different 2016 Ford Explorers, by the Department. As part of the fleet of police vehicles of the Department, these vehicles were designated car Nos.606 and 624.

76.     The 2016 Ford Explorers driven by LAKE and CREED, through the auspices of the Department, were part of a fleet of approximately 120 Ford Explorers owned and purchased by the Department.

77.     Upon information and belief, all of these Ford Explorers in the fleet were dangerous and defective when purchased, because of their design and exhaust and/or HVAC systems, which permitted an exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of these vehicles.

78.     The vehicle defects described herein are latent in nature, because they are not obvious or ascertainable upon reasonable examination or inspection.

79.     At the time of the purchase, neither the Department nor Plaintiffs were notified that the 2016 Ford Explorers that were bought were defective, nor were they notified that they and all occupants, including other police officers, would be exposed to lethal carbon monoxide and other potentially dangerous gases, while

80.     At some unknown time before September 2017, the Department installed carbon monoxide detectors in its fleet of Ford Explorer Police Interceptor vehicles.

81.     These monitors would routinely go off and the police officers were not advised until late 2017, that the source of the beeping sounds was carbon monoxide detectors.

18

82.    In or about the last quarter of 2017, LAKE commenced experiencing headaches, dizziness and respiratory distress while operating the subject Ford Explorer Police Interceptor vehicle.

83.    In or about the last quarter of 2017, CREED commenced experiencing headaches, dizziness and respiratory distress while operating the subject Ford Explorer Police Interceptor vehicles.

84.    On or about December 22, 2017 as a result of dangerous levels of carbon monoxide in the cabin of his assigned Ford Explorer, CREED commenced experiencing headaches, dizziness and respiratory distress. The hospital to which he was taken, noted elevated levels of carbon monoxide in his blood.

85.    On February 19, 2018 at approximately 11:50 p.m. LAKE was involved in a motor vehicle accident as a result of dangerous levels of carbon monoxide in the cabin of his assigned Ford Explorer. The hospital noted elevated levels of carbon monoxide in his blood.

85.    The Department notified FORD of the problem with the Ford Explorers in its fleet and FORD has failed to remedy, fix the defects or eliminate unsafe levels of carbon monoxide in the cabins of these vehicles.

86.    As of February 27, 2018, the Police Union has continued to question the Department with respect to the status of the repairs on these vehicles, because the carbon monoxide monitors and alarms have continued to go off, indicating unsafe levels of carbon monoxide in the cabins of these RMPs.

87.    The authorized Ford Fleet Representative has failed to fix the problem on behalf of the Department, which continues to subject police officers to dangerous fumes in the subject vehicles.

88.    Upon information and belief, the entire fleet of Ford Explorer Police Interceptor vehicles owned and/or operated by the Department underwent FORD'S earlier described Technical Service Bulletin repairs/replacements and the "fix" performed was unsuccessful.

89.    In the alternative, the authorized Ford Fleet Representative was aware of the carbon monoxide defects in the entire fleet of Ford Explorer Police Interceptor vehicles owned and/or operated by the Department, but did not know how to fix it.

90.    To date, FORD has not repaired the Department's Ford Explorers, nor has FORD acknowledged to Plaintiffs or the members of the proposed class or the county, municipal or state owners of these law enforcement modified Ford Explorers that the 2011 through 2017 model years contain design flaws and/or defective exhaust and/or HVAC systems, permitting lethal carbon monoxide and other potentially dangerous gases into the passenger compartments of these vehicles.

91.    Plaintiffs and members of the Class continue to act as driver/operators of the fleet of Ford Explorer Police Interceptor vehicles owned and/or operated by the Department and are subjected to an ongoing nefarious danger with carbon monoxide exposure, while driving these vehicles, as part of their job duties with the Department.

## CLASS ACTION ALLEGATIONS

92.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the members of a proposed Class.  The requirements of Rule 23(a), (b)(2) and (b)(3) are each met with respect to the classes defined below.

93.    Plaintiffs seek to represent the following Class:

**All New York police officers and law enforcement personnel who formerly or currently operate or drive at least one of the following vehicles, that has been modified by FORD, for police use: 2011 Ford Explorer, 2012 Ford Explorer, 2013 Ford Explorer, 2014 Ford Explorer,2015 Ford Explorer, 2016 Ford Explorer and/or 2017 Ford Explorer.**

94.    Numerosity.  Members of the class are so numerous that individual joinder of all members is impracticable.  Based upon information and belief, on an annual basis, FORD has sold approximately 32,000 of these vehicles modified for police use. All of these Ford Explorers are covered by TSBs 12-12-4 and 14-0130 and contain a defect that may cause carbon monoxide or exhaust to enter the passenger compartments of such vehicles.

95.    Existence of Common Questions of Law and Fact.  Common questions of law and fact exist as to all members of the class.  These include, but are not limited to:

(a)    whether the 2011 through 2017 model year Ford Explorers have been sold or leased subject to express and/or implied warranties;

(b)    whether each 2011 through 2017 model year Ford Explorer is defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles;

(c)    whether the 2011 through 2017 model year Ford Explorers modified for police use suffer from a design defect, are unreasonable, dangerous and/or are unfit for their intended use;

(d)     whether FORD has knowledge of such defect;

(e)      when FORD learned of such defect;

(f)      whether FORD failed to disclose the defect to Plaintiffs and the class;

(g)      whether FORD misrepresented that the affected vehicles were safe;

(h)      whether Ford has a "fix" for the defect and, if so, how much the fix will cost;

(i)      whether FORD'S express warranties cover the latent defects;

(j)      whether FORD breached its warranties made to plaintiffs and the class;

(k)      whether FORD negligently designed/engineered/manufactured the affected vehicles;

(l)      whether FORD concealed the defect; and

(m)      whether Plaintiff and the Class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.


96.      Typicality.  The claims of the Plaintiffs are typical of the claims of the Class, as Plaintiffs and members of the Class are law enforcement personnel who are user drivers/operators of these vehicles and have been physically harmed and personally injured in some manner by FORD'S conduct.

97.      Adequacy.  Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests do not conflict with the interests of the members of the Class.  Further, Plaintiffs have retained counsel competent and experienced in complex class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this action.

98.      Predominance and Superiority.  A class action is superior to other available methods for the fair and equitable adjudication of the controversy, since joinder of all the individual class members is impracticable.  Questions of law and fact common to the members of the class predominate over any questions affecting only individual members.  Likewise, because the damages suffered by each individual

class member may be relatively small, the expense and burden of individual members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

99.   The prosecution of separate actions by the individual class members would also create a risk of inconsistent or varying adjudications for individual class members, which would establish incompatible standards of conduct for FORD.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member. Further, Plaintiff anticipate no difficulty in the management of this litigation as a class action.

100.   For all the foregoing reasons, a class action is superior to all other available methods, for the fair and efficient adjudication of this controversy.

## COUNT I
## BREACH OF IMPLIED WARRANTY
## (N.Y. UCC 2-314)

101.   Plaintiffs re-allege and incorporate by reference, the allegations contained in the preceding paragraphs above, as if fully set forth herein.

102.   Section 2-314 of the N.Y. UCC states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ...." N.Y. U.C.C. LAW § 2-314.

103.    In order to be merchantable, products must be fit for the ordinary purposes for which the products are expected to be used. See *id.*

104.   UCC section 2-318 provides that a seller's warranty, whether express or implied, extends to any person, if it is reasonable to expect that the person will use the goods. *Id.* § 2-318.

105.   A purchaser of a vehicle may assert a breach of implied warranty claim against a seller if the car is not fit for its ordinary purposes.

106.   In asserting a claim against a manufacturer, New York has consistently held that absent privity of contract, a purchaser cannot recover for mere economic loss under a theory of breach of implied warranty.

107.   New York recognizes an exception to this rule, when the product's defect is a "thing of danger." In particular, where as here, a defect in a product makes its use a likely source of danger to several or many people, the manufacturer, as well as the vendor, is liable for breach of implied warranties.

108.   Here, the Ford Explorer Police Interceptor vehicles are each "dangerous," posing a significant safety hazard for drivers and passengers of the vehicles, as well as other travelers on the highway. thereby triggering the privity of contract exception.

109.   Since opening its investigation in July 2016, the National Highway Traffic Safety Association, has received at least 1,381 complaints from FORD drivers and passengers experiencing Carbon Monoxide exposure in the passenger cabins of Explorers, including Police Interceptor models.

110.   The Office Of Defect Investigation ("ODI") has identified three (3) crash events and 25 injury incidents citing a total of 41 injuries. The alleged injuries, as affirmatively indicated on the VOQ reports, range from unspecified to loss of

consciousness, with the majority indicating nausea, headaches, or light headedness. One police incident alleged a crash with related injuries, and a second police incident reported a physiological injury allegedly from carbon monoxide (CO) exposure. Another reported police incident resulted in a rollover crash event with injuries.

111.    Through cooperation with police agencies, ODI has reported that the Police Interceptor version of the Ford Explorer is experiencing exhaust manifold cracks, which appear to present a low level of detectability, and explain the origin of the Carbon Monoxide exposure in the passenger cabins.

112.    Police Interceptor versions of the Ford Explorer, containing defective exhaust manifold cracks within the subject vehicles, causing Carbon Monoxide exposure in the passenger cabins, are a "thing of danger."

113.    FORD entered into valid and binding contracts with Plaintiffs' employer, Nassau County Police Department, and similar law enforcement departments throughout the State of New York, to produce and manufacture Ford Explorer vehicles, specifically modified by FORD, as Police Interceptor Models to be used as marked police vehicles.

114.    These contracts were expressly intended to confer direct benefits on law enforcement officers, including Plaintiffs, who would be exclusively operating and driving these vehicles on a daily basis, to perform law enforcement duties.

115.    The benefits to Plaintiffs and Class members under these contracts with FORD were sufficiently immediate, rather than incidental.

116. Plaintiffs and Class members are third party beneficiaries under these contracts.

117. The UCC extends warranties horizontally to any natural person who is in the family or household of the buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty.

118. FORD impliedly warrantied that the subject vehicles, which it designed, manufactured, sold or leased, were merchantable, fit for the law enforcement purposes for which they were intended to be used, and were not otherwise injurious to law enforcement officers, including Plaintiffs and Class members, who would be operating and driving said vehicles on a daily basis, to discharge their official police duties.

119. FORD impliedly warrantied that the subject vehicles were fit for the purposes for which they were intended to be used, and that they could be operated and driven for normal and customary law enforcement activities, without unreasonably exposing its operators/occupants to safety and health risks.

120. FORD breached its implied warranty of merchantability when it designed, manufactured, distributed, sold and leased the 2011 through 2017 model year Ford Explorer Police Interceptor vehicles, in an unsafe and unmerchantable condition that exposed driver/occupants to unsafe carbon monoxide levels, while the vehicles were being driven in a normal and customary manner.

121.   Plaintiffs and members of the Class have sustained personal injury and disease from their continued and persistent exposure to dangerous levels of carbon monoxide in the restricted passenger compartments of these vehicles.

122.   Plaintiffs and members of the Class have sustained personal injury and disease directly or indirectly resulting from FORD'S breach of its implied warranty of merchantability.

123.   FORD, as the final manufacturer of the subject vehicles, is strictly liable for injuries caused by its product, because the product was negligently made when it left the party's control and the injured party was a reasonably foreseeable user.

124.   Plaintiffs and the members of the Class have suffered personal injury caused by FORD'S breach of the implied warranty of merchantability and are entitled to recover compensatory damages.

125.   FORD is liable to Plaintiffs and members of the Class for costs, including reasonable attorney's fees.

## COUNT II
### (General Municipal Law § 205- e)

126.   Plaintiffs re-allege and incorporate by reference, the allegations contained in the preceding paragraphs above, as if fully set forth herein.

127.   Police officers spend 10 times more time in their vehicles, than ordinary citizens. *Kochhar, D. S., & Tijerina, L. (2002). Police vehicle struck rear-end crashes. http://www.cvpi.com/pdfs/CVPI_Problem_Description.*

128.   General Municipal Law § 205- e provides, in pertinent part, as follows:

…In the event any accident, causing injury, death or a disease which results in death, occurs directly or indirectly as a result of any neglect, omission, willful or

culpable negligence of any person or persons in failing to comply with the requirements of any of the statutes, ordinances, rules, orders and requirements of the federal, state, county, village, town or city governments or of any and all their departments, divisions and bureaus, the person or persons guilty of said neglect, omission, willful or culpable negligence at the time of such injury or death shall be liable to pay any officer, member, agent or employee of any police department injured, or whose life may be lost while in the discharge or performance at any time or place of any duty imposed by the police commissioner, police chief or other superior officer of the police department…

129.   At all relevant times, Plaintiffs and members of the Class operated and occupied Ford Explorer Police Interceptor vehicles, for multiple hours, each daily shift, during which they lawfully discharged their duties as law enforcement officers.

130.   At all times, while operating and occupying Ford Explorer Police Interceptor vehicles, Plaintiffs and members of the Class were exposed to unacceptable and dangerous levels of carbon monoxide and other potentially dangerous gases in the restricted passenger compartments of these vehicles.

131.   In this case, the unambiguous language of the Motor Vehicle Safety Act, 49 U.S.C. § 30101-30170 ("Safety Act"), placed a duty on FORD, a vehicle manufacturer, to report vehicle or equipment defects. (See 49 U.S.C. § 30118(c)).

132.   The Safety Act states that a manufacturer of a motor vehicle has a duty to notify the NHTSA and vehicle owners when it "learns [that] the vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." *Id.* FORD breached this duty.

133.   Motor vehicle safety is defined as the "performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident ...." Id. § 30102(8).

134.   FORD breached its duty, pursuant to the Safety Act, to disclose that from 2011-2017 it sold or leased approximately 32,000 Ford Explorers modified for law enforcement use nationwide, and that each such vehicle was sold or leased in a dangerous and defective condition containing design flaws, and/or an exhaust and/or HVAC system that permit unacceptable levels of carbon monoxide to enter the passenger compartment, during the normal and customary use of such vehicles.

135.   FORD breached its duty, pursuant to the Safety Act, to disclose that exhaust manifold cracks, were among the causes of the dangerous levels of carbon monoxide in the restricted passenger compartments of Ford Explorer Police Interceptor vehicles.

136.   Through customer complaints filed directly with FORD, Ford's authorized dealerships, NHTSA, internet websites, and other public venues, FORD had knowledge of the defects but did not disclose them to the Plaintiffs or the Class.

137.   The defects, as described herein, pose a risk of accidents, deaths and/or injuries, which directly relates to motor vehicle safety as defined by the Safety Act.

138.   All reasonable inferences can be made that FORD not only knew of the defect, but also that FORD actively concealed its internal determination that the defect relates to motor vehicle safety.

29

139.   In addition to breaching its duties under the Motor Vehicle Safety Act, FORD also breached its implied warranty of merchantability under the UCC, as alleged herein.

140.   The continued and pervasive exposure to dangerous levels of carbon monoxide has adversely affected the health and safety of Plaintiffs and members of the Class.

141.   Plaintiffs and members of the Class have sustained personal injury and disease from their continued and persistent exposure to dangerous levels of carbon monoxide in the restricted passenger compartments of these vehicles.

142.   Plaintiffs and members of the Class have sustained personal injury and disease directly or indirectly resulting from the neglect, willful omissions and culpable conduct of FORD, as herein described.

143.    FORD is liable for damages that will fairly and justly compensate Plaintiffs and members of the Class, for all personal injuries directly or indirectly sustained as a result of FORD'S neglect, willful omissions and culpable conduct, as herein described.

144.   FORD is liable to Plaintiffs and members of the Class for costs, including reasonable attorney's fees.

## COUNT III
### (N.Y. General Business Law, §349)

145.   Plaintiffs re-allege and incorporate by reference, the allegations contained in the preceding paragraphs above, as if fully set forth herein.

146.    Section 349 of the New York General Business Law states that "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" are unlawful. N.Y. Gen. Bus. § 349(a).

147.    Plaintiffs state a claim for omission under the GBL, because FORD alone, possessed material information that is relevant to the consumer and failed to provide this information.

148.    FORD alone, possessed material information that is relevant to the consumer, and failed to disclose that the exhaust manifold cracks in the subject police vehicles, were the causes of the dangerous levels of carbon monoxide and other potentially dangerous gases in the restricted passenger compartments.

149.    FORD knew of this defect by, at least, December 2012, and did not notify purchasers of this defect or how to correct it.

150.    FORD designed, manufactured, sold and leased the 2011 through 2017 model year Ford Explorers, which contained the same defects and failed to notify purchasers of these defects or how to correct them.

151.    FORD has failed to disclose that FORD'S Technical Service Bulletin repairs/replacements have not eliminated the dangerous levels of carbon monoxide and other potentially dangerous gases in the restricted passenger compartments of Police Interceptor vehicles and that the "fix" recommended by FORD is ineffective and does not rectify the defect.

152.    All of the foregoing omissions by FORD were materially misleading, and such deceptive practices were likely to mislead a reasonable consumer acting reasonably under the circumstances.

153.   FORD'S actions and conduct, as described herein, constitute a material deception and fraudulent business practice in violation of New York General Business Law, §349.

154.   FORD'S actions and conduct, as described herein, have directly caused Plaintiffs and members of the Class to have suffered ascertainable loss.

155.   Plaintiffs and members of the Class have suffered actual injury and loss as a direct result of FORD'S violations of New York General Business Law, §349, in that they have been compelled to incur the costs and expenses to retain legal representation to protect their legal interests, arising from their pervasive exposure to unacceptable and dangerous levels of carbon monoxide and other potentially dangerous gases in the restricted passenger compartments of the subject police vehicles, that they are compelled to drive/operate.

156.   As a proximate result of FORD'S continuing violations of New York General Business Law, §349, FORD is liable to Plaintiffs and members of the Class for compensatory damages.

157.   As a proximate result of FORD'S continuing violations of New York General Business Law, §349, FORD is liable to Plaintiffs and members of the Class for consequential damages.

158.   Punitive damages are expressly waived on behalf of the Class.

159.   As a proximate result of FORD'S continuing violations of New York General Business Law, §349, FORD is liable to Plaintiffs and members of the Class for reasonable attorney's fees and the costs of this litigation.

160.    Plaintiffs and members of the Class are entitled to injunctive and other equitable relief, enjoining FORD'S continuing violations of New York General Business Law, §349, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, respectfully requests judgement against FORD, as follows:

(a)    Certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

(b)    Awarding Judgment to Plaintiffs and all Class Members, for all available damages and other relief under the FIRST COUNT asserted;

(c)    Awarding Judgment to Plaintiffs, individually, for all available damages and other relief under the SECOND COUNT asserted;

(d)    Awarding Judgment to Plaintiffs and all Class Members, for all available damages and other relief under the THIRD COUNT asserted;

(e)    Enjoining FORD from selling or leasing any Ford Explorer Police Interceptors, with carbon monoxide leakage defects, that exposes law enforcement operators and/or passengers to hazardous, unsafe and unhealthy conditions;

(f)    Enjoining Plaintiffs and members of the Class from operating/driving 2011-2017 FORD Explorer Police Interceptors, until such time that FORD repairs and/or replaces defective parts/systems in the subject vehicles, to prevent carbon monoxide from entering the passenger compartments thereof;

(g)    Awarding Plaintiffs and members of the Class attorneys' fees and costs; and

(h)    Awarding any other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues.

Dated: July 12, 2018

BLAU, LEONARD LAW GROUP, LLC

_____
Steven Bennett Blau
Shelly A. Leonard
23 Green Street, Suite 303
Huntington, NY 11743
(631) 458-1010
sblau@blauleonardlaw.com
sleonard@blauleonardlaw.com


BROWN PAINDIRIS & SCOTT, LLP:
Bruce E. Newman
747 Stafford Avenue
Bristol, CT 0601
Tel: (860) 583-520
Fax: (860)589-5780
bnewman@bpslawyers.com


*Attorneys for Plaintiffs*

34